Charles W. Hingle (Bar No. 1947)
Shane P. Coleman (Bar No. 3417)
HOLLAND & HART LLP
401 North 31st Street, Suite 1500
P.O. Box 639
Billings, Montana  59103-0639
Telephone:  (406) 252-2166
Facsimile:  (406) 252-1669
chingle@hollandhart.com
spcoleman@hollandhart.com

Robert R. Bell (admitted *pro hac vice*)
Mullins Hoard & Brown, LLP
500 S. Taylor, Suite 800
Amarillo, Texas 79101
Telephone:  (806) 372-5050
Facsimile:  (806) 371-6230
rbell@mhba.com

Kevin W. Barrett (admitted *pro hac vice*)
Bailey & Glasser LLP
209 Capitol Street
Charleston, West Virginia 25301
Telephone:  (304) 345-6555
Facsimile:  (304) 342-1110
kbarrett@baileyglasser.com

ATTORNEYS FOR BRIAN A. GLASSER, AS TRUSTEE
OF THE YELLOWSTONE CLUB LIQUIDATING TRUST

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re:<br><br>YELLOWSTONE MOUNTAIN CLUB, LLC, *et al.*,<br><br>        Debtors. | Case No. 2:13-cv-00068-SEH |
| BRIAN A. GLASSER, AS TRUSTEE OF THE YELLOWSTONE CLUB LIQUIDATING TRUST,<br><br>        Plaintiff,<br><br>v.<br><br>TIMOTHY L. BLIXSETH, CASA 20 LLC, TAMARINDO LLC, JOHN DOES 1-100 and XYZ CORP. 1-100,<br><br>        Defendants. | Bankruptcy Case No. 08-61570-11<br>Adversary No. 10-00064<br><br><br>**PLAINTIFF'S STATEMENT OF POSITION ON THIS COURT'S JURISDICTION AND IN RESPONSE TO DEFENDANTS' PETITION FOR IMMEDIATE RELEASE OF TIMOTHY L. BLIXSETH FROM CUSTODY** |

Blixseth's petition for immediate release and the "new accounting" upon which he bases it represent yet another metaphor for this entire contempt proceeding. Blixseth offers up still another new and distinct "accounting"—at least his seventh so far—prepared, allegedly, by yet another set of professionals not before the Court that makes very limited progress without really accounting for the Tamarindo proceeds. And, still, he manages to demonstrate in both words and actions his utter contempt for this Court and its orders and processes. In fact, Blixseth's submission itself appears to have been little more than the centerpiece of an elaborate set-up: an attempt to elicit an order of this Court delaying his release, if even for only a very short time to afford the Court and the Trust time to review and consider the 9,000 page "accounting," just so that Blixseth could file yet another motion for a stay—his fourth—with the Court of Appeals premised upon this Court's refusal to grant his ***immediate*** release from jail without having any time to review the submission and determine its compliance.[1]

---

[1] In this respect, Blixseth played the tantruming toddler. To this Court, he emphasized the breadth and depth of his new accounting. But when he did not immediately get his way, he went to his other parent, the Court of Appeals, and tried out a new argument: there really is nothing much new in the "new accounting," and the District Court should have been able to immediately discern his full and complete compliance and released him. *See* Petitioner's Emergency Motion for an Immediate Stay of Incarceration Order, *Blixseth v. U.S. Dist. Court (In re Blixseth)*, No. 15-71251 (9th Cir., June 5, 2015) [Dkt 15-1] at p. 12. ("Importantly, although the new accounting had approximately 9,000 pages of supporting financial records, only approximately 50 of those pages were records *that had not already been filed with the District Court* . . .") (emphasis in original).

The Court of Appeals had none of it, denied his petition for a writ of mandamus, his request to reassign this matter to a different judge, and all his related motions for a stay and release including a last minute plea for a release on alleged humanitarian grounds,[2] and even directed him not to move for reconsideration of its order.[3]   This Court, too, should have none of Blixseth's charade, and should deny his petition for release until he demonstrates appropriate respect for the Court and its orders and provides a full and effective accounting and explanation of what happened to the Tamarindo proceeds in accordance with this Court's orders.   The Court should also open the Trust's recommended new phase of these contempt proceedings to hold accountable all the others who acted in concert and participated with Blixseth in violating the Tamarindo injunction and disposing of the Tamarindo proceeds.   Indeed, the Court should expand the prior list of putative aiders and abettors to include Blixseth's son Beau who submitted a declaration with Blixseth's new accounting intended to justify the $223,000 in transfers of the Tamarindo proceeds made to him, albeit without denying his knowledge of the relevant facts and without any documentary support.

---

[2] *See* Declaration of Bonnie Abramsson in Support of Petitioner Timothy L. Blixseth's Renewed Emergency Motion for a Stay, *Blixseth v. U.S. Dist. Court (In re Blixseth)*, No. 15-71251 (9th Cir., June 8, 2015) [Dkt 16].

[3] *See* Order, *Blixseth v. U.S. Dist. Court (In re Blixseth)*, No. 15-71251 (9th Cir., June 8, 2015) [Dkt 17].

**I.  This Court Has Jurisdiction to Hear and Determine Blixseth's Petition**

Immediately after Blixseth filed his petition for immediate release, this Court raised a question as to its jurisdiction to hear and determine the petition in light of Blixseth's then-pending petition for a writ of mandamus and request to reassign this matter to a different judge.[4]  Since the entry of that order, the Ninth Circuit has issued an order denying the petition and request.[5]  As a result, there is no jurisdictional impediment to this Court's consideration of Blixseth's petition and the associated "accounting."

**II.  Blixseth's Accounting Fails to Comply with This Court's Orders[6]**

In petitioning for his immediate release, Blixseth again attempts to demonstrate his compliance with this Court's orders if with nothing else than an overwhelming volume of paper.  In fact, however, in reproducing 9,000 pages of virtually the same set of papers he had submitted before, Blixseth's accounting follows the same contemptuous approach he has used all along.  This time with some cross-referencing and citation to backup documentation that serves to demonstrate that "all proper and required documentation has *[not]* been submitted"

---

[4] *See* Order [Doc 186] at ¶ 2.

[5] *See* Order [Doc 188].

[6] If the following description of the failings of Blixseth's accounting has a familiar ring, it is because the description, in large part, comes verbatim from the Trust's response to Blixseth's February 2015 accounting.

as this Court has required,[7] Blixseth's so-called accounting has simply transformed from a document dump to an information dump, as he again effectively says to the Court, "It's all in here.  Go and figure it out yourself."  And, once again, Blixseth's information dump comes up short, still depriving the Court of the ability to trace the proceeds fully and completely through the far-flung Blixseth system or verify the accuracy or reliability of the information provided.

Blixseth has, in fact, done little more than repackage what he already produced.  He admitted as much when he moved for an immediate stay in the Court of Appeals when this Court did not order his immediate release.[8]  Despite this Court's express requirement,[9] Blixseth has done nothing to produce missing documents with respect to the Mexican accounts, Desert Ranch Management and Western Pacific Timber.  He produced wholly inadequate documentation regarding funds paid to his immediate family members—none of his son Beau who received $223,000 in Tamarindo proceeds and only heavily excerpted bank account

---

[7] April 20 Order at p. 13.

[8] Blixseth himself acknowledges in pleadings filed with the Court of Appeals that the new accounting adds only 50 pages of new material, virtually all of which consist of the new "accounting" prepared by his new team of accountants.  *See* Renewed Emergency Motion Under Circuit Rule 237-3, *Blixseth v. U.S. Dist. Court (In re Blixseth)*, No. 1571251 [Dkt 15-1], at p. 2.

[9] April 20 Order at p. 15-16 & n. 42.  Beau Blixseth has provided no bank account information despite his receipt of some $223,000 in Tamarindo proceeds. Blixseth's wife Jessica produced incomplete bank account statements that show only the deposit of funds and not any expenditure therefrom.  *See* Doc 181-26.

statements of his wife that fail to provide any information as to how she disposed of $254,000 in proceeds transferred directly into her account.[10]  Even the "new" elements of the "accounting" itself are little more than a repackaged mishmash of his previously produced bank account statements and general ledgers.  And, still, especially with large gaps in the information and backup and no real summary of the various expenses across all the various entities and accounts, it remains virtually impossible to determine how Blixseth really disposed of the Tamarindo proceeds, where all the proceeds really went, or how much of the Tamarindo proceeds ended up or may even remain in his, his family's, or his attorneys' hands.

In this accounting, as in his previous attempts, Blixseth fails to provide basic documents and information in contravention of this Court's January 9, 2015 Order [Doc 112] specifying exactly what Blixseth had to produce as part of his accounting.  Nowhere, for example, does Blixseth (or his new accountants) categorize and total the various expenditures of those proceeds as required in paragraphs 1.a., 1.b., 1.d., and 1.e. of the January 9 Order.  Nowhere does Blixseth (or his new accountants) explain the purpose of the intercompany transfers as specifically required in paragraph 1.c. of the January 9 Order.   Nowhere does Blixseth (or his new accountants) explain the real purpose of any particular expenses and other entries in Mexico, as specifically required in paragraphs 1.b,

---

[10] *See* Doc 181-26.

1.c., and 1.e. of the January 9 Order.    For Blixseth (or, more accurately, his new accountants) has provided only the barest of explanations—a word or two or three[11]— that cannot be considered descriptive of purpose in any meaningful way.    And, finally, Blixseth fails again to make the personal declarations required under paragraphs 1 and 5 of the January 9 Order, having chosen again to rely fully and completely for his accounting upon the work of yet another set of accountants not before the Court and declaring only that that accountants' work "accounts in full for the sale of the Tamarindo Hotel and Resort as ordered by this Court" and not that the accounting is "true and correct" as required under this Court's January 9 Order and 28 U.S.C. § 1746.[12]   In addition, Blixseth seems to have ignored completely this Court's additional requirement as set forth in the third decretal paragraph of the April 20 order that Blixseth verify that he had corrected the deficiencies identified in the order and provide admissible supporting data in connection therewith.[13]

The "new accounting" also generates an entirely new set of issues and problems that, like each of his prior accountings, render it impossible to verify the

---

[11] *See, e.g.,* "Category/Purpose" column in Doc 178-2.

[12] *See* Blixseth Declaration [Doc 178] at ¶ 6.

[13] April 20 Order at p. 27.   In fact, it appears that Blixseth left the verification that he corrected the deficiencies to his attorney in the petition itself.  *See* Doc 177 at pp. 2-8.

accuracy and reliability of the accounting and prevent a full understanding of Blixseth's disposition of the Tamarindo proceeds.  Of particular note:

- <u>The new accounting simply adds yet another level of inadmissible hearsay testimony to the accounting</u>.  The new accounting consists of what appears to be a series of spreadsheets prepared, allegedly, by an accounting firm in Idaho.  The spreadsheets seem only to collect and summarize information otherwise provided in the bank statements and general ledgers that Blixseth previously provided in his so-called accountings.  Blixseth does not even offer a declaration of the new accounting firm and simply recites in his own declaration the purported qualifications of the accountants and the firm without even the faintest hint of evidentiary support.  Thus, far from allowing the Court to determine whether the accounting and Blixseth's statements with respect thereto are accurate and whether the information submitted is accurate and reliable,[14] the "new accounting" creates only a new level of hearsay statements and an entirely new set of issues

---

[14] *See* April 20 Order at p. 17.

with respect to the accuracy, reliability, and credibility of the "accounting."[15]

- The new accounting replaces unattested business records with unattested summaries of those business records. In his previous accountings, Blixseth produced general ledgers for many (but not all) of the entities that received Tamarindo proceeds. Those general ledgers appear to have been business records of the relevant entities, though Blixseth did not offer the testimony necessary to support that conclusion. The spreadsheets of the new accounting appear only to summarize certain information from the general ledgers and bank accounts and essentially replace the general ledgers as the proffered evidence of the accounting. Once again, however, Blixseth fails to offer the evidence necessary to support the use of those summaries.

- The summary accountings contain substantial gaps in the information provided. On the face of each summary, there are significant gaps in

---

[15] It is significant, for example, that Blixseth's new accounting seems to omit entirely the transfers with Western Pacific Timber and JTB, LLC, thus raising the specter that Blixseth's accountants picked and chose among Blixseth's books and records and disclosed some items while excluding others. Moreover, as discussed below, the new accounting also changes the descriptions contained in the general ledgers in both form and substance.

the provision of background documentation.[16]   As before, the gaps appear to remain particularly large with respect to the Mexican entities, as to which Blixseth has provided absolutely no new documentation.[17]   In addition, there are numerous entries in the new accounting for items such as "unknown,"[18] "payroll,"[19] "employees,"[20] or "client"[21] for which no (or at least no comprehensible) detail even as to the particular payees is provided. The absence of any further detail as to those items raises significant questions as to whether those funds may have actually been transferred to Blixseth or any of his related companies or family members.   At a minimum, the Court is left to assume the accuracy, reliability, and veracity of the new accounting's designations without any way of testing or confirming them.

---

[16] *See, e.g.,* Doc 178-2 at pp. 3-9 & 11-13 (evidencing blanks in the last column referencing the back-up documentation).

[17] *See, e.g.,* Doc 180-1.

[18] *See, e.g.,* Doc 178-2 at p. 8, 9, 11 (showing five payments to unknown payees for unknown purposes totaling $13,083.53).

[19] *See, e.g.,* Doc 179-2 at pp. 2-12 (showing many purported payments of payroll to unknown payee(s) totaling $522,078.17).

[20] *See, e.g.,* Doc 180-1 at pp. 3, 5, 6, & 11 (showing a $77,181.74 payment and three additional payments of smaller amounts to "employees" with no backup documentation provided).

[21] *See, e.g.,* Doc 180-1 (showing roughly twenty-five payments to "client").

- <u>Despite the inclusion of cross-references and citations, the new accounting for the Mexican entities fails to provide any further verification of accuracy or completeness</u>.  For Blixseth's Mexican entities and accounts, the new accounting purports to cite and cross-reference backup documentation written entirely in Spanish and denominated in pesos.  Particularly in light of the translations he previously provided to the Court,[22] Blixseth's decision to cross-reference and cite to the Spanish language-peso denominated backup is inexplicable.  And, inasmuch as the new accounting is denominated in dollars, the new accounting renders it virtually, if not entirely, impossible to verify any of the payments made out of the Mexican entities, even if one were able to read the backup documentation in Spanish.

The foregoing errors are neither minor nor inconsequential.  As a result of the foregoing deficiencies in the new accounting, this Court is still left without any real ability to assess the accuracy, reliability, or completeness of the new accounting.  And Blixseth's "new accounting" does not properly form a basis for his immediate release in accordance with this Court's April 20 Order or otherwise.

---

[22] *See* Docs 148, 149 & 150.

**III.  Blixseth's Attempts to Explain the Payments to His Wife and Son Fall Short**

While failing to provide any new or further detail on the accounting or declare the truth and accuracy of the information contained in the "new accounting," Blixseth attempts to explain two very small subset of issues the Trust previously identified with Blixseth's expenditure of the Tamarindo proceeds—the payment of $41,666 per month to his wife and the payment of $100,000 to his son Beau.[23]  The reasons for singling out those two items alone out of the dozens of personal transfers the Trust identified, including other transfers to or for the benefit of his wife and son, are a mystery, as are the conclusions Blixseth draws therefrom. Nevertheless, neither explanation goes far enough, provides any documentation of the underlying facts, or proves that his wife and son did not receive Tamarindo proceeds.

Blixseth claims that the monthly payments of $41,666.66 to his wife out of the Kawish LLC accounts actually represented a pass-through of monthly management fees paid by Western Pacific Timber, LLC to Kawish and by Kawish to his wife Jessica.  As an initial matter, money is fungible, and once it is deposited with other funds becomes indistinguishable.  There is, therefore, no way of directly establishing that the money paid to Kawish was the same money Kawish paid to Mrs. Blixseth, given the fact that the accounts during the relevant time period held

---

[23] *See* Doc 152 at pp. 9-11.

other funds.  Nor does the new accounting cite even to any evidence supporting the conclusion that the money was actually paid by Western Pacific Timber or, in some cases, to Mrs. Blixseth.[24]   More importantly, however, the two sets of payments appear to have no legally cognizable connection:  Blixseth does not even allege that his wife had any legal right to payment of alleged "management fees" or participated in the management of Western Pacific Timber; as a result, the payments to Mrs. Blixseth plainly did not represent the payment of management fees and instead necessarily represented something else.  The blatant contradiction between the "new accounting," the statements in Blixseth's declaration, and the documents he provided in his previous accounting, most particularly Kawish's own internally prepared general ledger, suggest that the something else was, in fact, the payment of his wife's monthly allotment of "personal expenses."   Whereas Kawish's general ledger denominated the payments to Jessica Blixseth as the payment of "personal expenses,"[25] the new accounting—once again an entirely new document purporting to summarize bank statements and the general ledger

---

[24] At least one of the cross-references is to a fully redacted bank statement that does not show a deposit or payment of $41,666.66.  *See* Doc 179-8 at p. 2 and the cross reference to Doc 182-9 at ER 933.   Another deposit and payment of $41,666.66 which are only partially viewable reference only "deposit" and "descriptive withdrawal outgoing wire," there being no reference whatsoever to Western Pacific Timber or Mrs. Blixseth.  *See* Doc 179-8 at p. 5 and the cross reference to Doc 183-10 at ER 2083.

[25] *See, e.g.,* Doc 113-8 at p. 1.

and prepared by a new set of accountants not before the Court—deletes any reference of payments to Mrs. Blixseth and changes the purpose of the payment from "personal expenses" to "property management."[26]   Indeed, the "new accounting" itself contradicts Blixseth's statement in his declaration.   While Blixseth characterizes the alleged payments as a management fee paid by Western Pacific Timber to Kawish in his declaration,[27] the new accounting describes the deposits as "***Tim's Salary from WPT***" and the payments as a "transfer of ***Tim's WPT salary***."[28]   As a result, not only does Blixseth's statement have absolutely no support in the record, that statement and the "new accounting" appear to have been ginned up in that regard in an attempt to try to shield his wife from potential contempt liability for those transfers.[29]

Blixseth's statements as to the payments to Beau Blixseth are equally puzzling.   In his declaration, Blixseth nowhere claims that the $100,000 payment to Beau Blixseth was not made out of the Tamarindo proceeds.   In addition, he does not even purport to justify the payments or provide any evidence, other than

---

[26] *See* Doc 179-8 at pp. 2, 5, 7, 8 & 9.

[27] Blixseth Declaration [Doc 178] at ¶ 8.

[28] *See* Doc 179-8 at pp. 2, 5, 7, 8 & 9.

[29] It is equally intriguing that the new accounting attaches only a portion of Mrs. Blixseth's bank account statements, the pages showing the deposit of the $41,666.66 but none of the pages showing how she disposed of those funds.   *See* 181-26.

his own statements, supporting the notion that the payments represented a payment "for management responsibilities with regard to Desert Ranch Management."[30] Nor does Beau Blixseth deny in his declaration that the payment was made out of the Tamarindo proceeds, or otherwise justify the payments or provide any evidence relating to his right to the "management fee."   In fact, the younger Blixseth acknowledges that, in addition to the purported management fee, he received an additional payment of $123,294.94 from Blixseth Group of Washington during the relevant period and apparently out of the Tamarindo proceeds.[31]   It thus appears that Beau Blixseth received two transfers totaling $223,294.94 of the Tamarindo proceeds, a fact neither he nor his father deny in their declarations.

## IV.   The Court Should Issue Orders to Show Cause Against the Putative Aiders and Abettors

In its prior response [Doc 152] and in a separate motion and brief [Docs 170 & 171] filed at the request of the Court, the Trust recommended that the Court issue orders requiring Blixseth's corporate entities, his wife and marital estate, and certain of his lawyers in the Tamarindo lawsuit to show cause why they should not be held in contempt under Federal Rule of Civil Procedure 65(d)(2).   There is nothing in the "new accounting" suggesting that the Court should not proceed against any of those entities or persons.   Rather, the sheer number of "parts" and

---

[30] Blixseth Declaration [Doc 178] at ¶ 9.

[31] Beau Blixseth Declaration [Doc 185] at ¶ 4; *see* Doc 179-2 at p. 3.

"sections" in Blixseth's "new accounting" serves only to emphasize, yet again, the complex web of interrelated companies and persons that participated with Blixseth in laundering and disposing of the proceeds.

In fact, the declarations of Blixseth and his son suggest that the Court should broaden the previously requested orders to show cause to include Beau Blixseth as a subject.   Neither declarant denies that the $223,000 in money paid to Beau Blixseth was paid out of the proceeds of the Tamarindo sale.  And, although each declarant directly addresses those transfers and obviously knows of the issues relating thereto, neither denies that Beau Blixseth knew about the Tamarindo injunction, the Tamarindo sale, or that he had received proceeds of the illicit sale. Further, Beau Blixseth's submission of a declaration addressing specific details of the contempt exposes him to the exercise of this Court's jurisdiction to hear and determine the issues raised.   And this Court appears, independent of the declaration, to have personal jurisdiction over Beau Blixseth as a result of his apparent ownership and management of a Montana limited liability company with a Montana address which received the proceeds of at least one other Blixseth fraudulent transfer[32] and may own other property or have other connections in the State of Montana.

---

[32] Documents the Blixseths produced in the Trust's pending litigation against Jessica Blixseth and her marital estate and LLC, among others, reveals that Beau Blixseth owns and manages Red Rock Investments LLC, a Montana limited

For the foregoing reasons, the Trust recommends that the Court deny Blixseth's petition for release from incarceration and promptly enter orders requiring that Blixseth's corporate entities, wife and marital estate, son, and lawyers show cause why they should not be held in contempt under Rule 65(d)(2) in accordance with the requests and procedures set forth in the Trust's prior motion and brief.

Dated:  June 12, 2015

                                             */s/ Charles W. Hingle*
                                             Charles W. Hingle
                                             Shane P. Coleman
                                             HOLLAND & HART LLP
                                             401 North 31st Street, Suite 1500
                                             P.O. Box 639
                                             Billings, Montana  59103-0639
                                             chingle@hollandhart.com
                                             spcoleman@hollandhart.com

                                             Robert R. Bell (admitted *pro hac vice*)
                                             MULLINS HOARD & BROWN, LLP
                                             500 S. Taylor, Suite 800
                                             Amarillo, Texas 79101
                                             Telephone:  (806) 372-5050
                                             Facsimile:  (806) 371-6230
                                             rbell@mhba.com

---

liability company that purportedly loaned money to the Blixseths' Western Air & Water LLC and received payment of proceeds of the sale of one of Western Air & Water's assets, the Blixseths' 58-foot fishing boat known as "Piano Bar Too."  The documents list Red Rock Investments address as 26 East Mendenhall, Boseman, MT 59715 and identify Beau Blixseth as the "payoff contact."

Kevin W. Barrett (admitted *pro hac vice*)
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, West Virginia 25301
Telephone:  (304) 345-6555
Facsimile:  (304) 342-1110
kbarrett@baileyglasser.com

**ATTORNEYS FOR BRIAN A. GLASSER, TRUSTEE OF THE YELLOWSTONE CLUB LIQUIDATING TRUST**

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2) of the Local Rules of the U.S. District Court of the District of Montana, I certify that this brief is printed with a proportionately spaced Times New Roman text typeface of 14 points; is double-spaced; and the word count calculated by Word 2010 is 3,759 words, excluding caption, certificates of service and compliance.

DATED this 12th day of June, 2015.


*/s/ Charles W. Hingle*

## CERTIFICATE OF SERVICE

I, the undersigned, certify under penalty of perjury that on June 12, 2015 copies of the foregoing **PLAINTIFF'S STATEMENT OF POSITION ON THIS COURT'S JURISDICTION AND IN RESPONSE TO DEFENDANTS' PETITION FOR IMMEDIATE RELEASE OF TIMOTHY L. BLIXSETH FROM CUSTODY** were served electronically by the Court's CMECF notice to all persons/entities requesting special notice or otherwise entitled to the same and that in addition service by mailing a true and correct copy, first class mail, postage prepaid, was made to the following persons/entities who are not ECF registered users:  None.

                                                    */s/ Charles W. Hingle*

7850839_1

20