**FILED**

DEC 3 0 2015

Clerk, U.S. District Court
District Of Montana
Helena



# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MONTANA

# BUTTE DIVISION

| | |
|---|---|
| In re<br><br>YELLOWSTONE MOUNTAIN<br>CLUB, LLC,<br><br>     Debtor<br>———————————————<br>BRIAN A. GLASSER, SUCCESSOR<br>TRUSTEE OF THE YELLOWSTONE<br>CLUB LIQUIDATING TRUST,<br><br>     Plaintiff,<br><br>vs<br><br>TIMOTHY L. BLIXSETH, CASA 20<br>LLC, TAMARINDO LLC, JOHN<br>DOES 1-100, and XYZ CORP. 1-100,<br><br>     Defendants. | No. 15-73820<br><br><br>Case No. 08-61570-11<br>Adversary No. 09-00064<br><br><br>No. CV-13-68-BU-SEH<br><br><br>**FINDINGS OF FACTS<br>CONCLUSIONS OF LAW<br>AND ORDER** |

## INTRODUCTION

Contempt proceedings against Timothy L. Blixseth ("Blixseth") commenced December 23, 2013.[1] Two separate hearings were conducted before a final on the record evidentiary hearing was held on October 19, 2015.[2] Plaintiff Brian A. Glasser, as Trustee of the Yellowstone Club Liquidating Trust (the "Trust") was represented by Michael L. Murphy, Esq., Kevin W. Barrett, Esq., and Shane P. Coleman, Esq. Blixseth was represented by Paul Brain, Esq., Phillip J. DeFelice, Esq., and Michael J. Ferrigno, Esq. Oral testimony was presented and documentary evidence was introduced. The findings of fact and conclusions of law stated below are drawn from the record.[3]

## FINDINGS OF FACT

### *Background*

1.     These proceedings arise from the continued failure of Blixseth to account fully and properly for the proceeds of the sale of the Tamarindo Resort ("Tamarindo"), a sale carried out in direct defiance of the Bankruptcy Court's order, and his subsequent refusal and failure to fully and properly account for

---

[1] Doc. 58.

[2] *See* Doc. 99, 158, and 343.

[3] 2:13-cv-00068-SEH; Bankruptcy Case No. 08-61570-11.

those proceeds in compliance with the requirements of the Court's Orders of

January 9, 2015[4] and April 20, 2015.[5]

2. The Trust is charged with prosecuting, enforcing, and collecting

approximately $260 million in existing federal court judgments against Blixseth

and his related corporate entities for absconding with the assets of the Yellowstone

Mountain Clubs' defrauded creditors. Those responsibilities encompass the

recovery of the proceeds of the sale of Tamarindo, and the injunction against the

sale of Tamarindo which served as the Trust's sole security for its judgments, from

Blixseth, from his lawyers and representatives, and from any other third parties

who aided and abetted in the sale of Tamarindo.[6]

3. By order of Court dated April 20, 2015, Blixseth is currently

incarcerated for his ongoing and continuing failure to account for the Tamarindo

sale proceeds.[7]

---

[4] Doc. 112.

[5] Doc. 159.

[6] On July 17, 2015, the Trust moved against approximately 20 third parties requesting that they appear and show cause as to why they did not aid and abet Blixseth in the sale and distribution of the proceeds from the sale of the Tamarindo Resort. (Docs. 201-246). On July 21, 2015, the Court entered each of the requested orders. (Docs. 249-270). Those third parties filed responsive pleadings on or about August 24, 2015. Those proceedings remain pending before the Court. The Trust is considering pursuing a number of remedies against these third parties, including imposing a constructive trust, upon a finding by the Court that they violated Rule 65.

[7] Doc. 159.

3

### *Factual and Procedural Background*[8]

4.     On September 21, 2009, Blixseth stipulated to, and United States

Bankruptcy Judge Ralph B. Kirscher issued, a temporary injunction in adversary

proceeding No. 09-00064 prohibiting Blixseth from selling or transferring a hotel

and resort in Mexico known as Tamarindo.[9]  Judge Kirscher extended the

temporary injunction by stipulated orders entered November 6, 2009, December

29, 2009, February 8, 2010, and February 26, 2010.[10]

5.     On May 10, 2010, Blixseth stipulated to, and Judge Kirscher entered,

the following injunction:

> Defendants and others acting on their behalf or in concert with them are
> prohibited from selling, transferring, disposing, encumbering or otherwise
> liquidating the Tamarindo resort property described in Count III of the
> Complaint (the 'Tamarindo Property').  Furthermore, Defendant Timothy
> Blixseth is enjoined from any actions to sell, transfer, dispose of, encumber
> or otherwise liquidate, or causing any entity owned or controlled by him to
> sell, transfer, dispose of, encumber or otherwise liquidate, the Tamarindo
> Property without prior order of the Court.[11]

---

[8] The material in this section is drawn from the records of prior proceedings in the United States Bankruptcy Court and this Court.

[9] *See Kirschner v. Blixseth*, AP 09-00064-BU-RBK, Doc. 9 at 1 (Bankr. D. Mont. Sept. 21, 2009).

[10] *See* Kirschner v. Blixseth, AP 09-00064-BU-RBK, Docs. 17, 36, 44, 46 (Bankr. D. Mont.).

[11] *See Kirschner v. Blixseth*, AP 09-00064-BU-RBK, Doc. 57, at 2 (Bankr. D. Mont. May 10, 2010).

4

6. Two months later, with the stipulated injunction remaining in place, Blixseth moved for an order vacating the injunction.[12]

7. Notwithstanding the continuing injunction prohibiting sale, in late 2010 or early 2011, Blixseth began an effort to sell Tamarindo.[13]

8. Blixseth produced a document during proceedings in this case purportedly dated November 1, 2010, by which he asserted to have engaged Kawish LLC, a Washington limited liability company he owned and managed, to act as the exclusive agent for the sale of Tamarindo.[14] In reality, however, he appears to have marketed Tamarindo only through his Mexican attorney, Ben Rosen.[15]

9. Initial sale efforts, however, drew little interest and no firm offers.[16] Effort to sell Tamarindo, however, took on a much greater sense of urgency when, on April 5, 2011, the States of California, Idaho, and Montana filed an involuntary

<hr />

[12] Doc. 68.

[13] *See* Doc. 335-1 at 33-34.

[14] *See* Doc. 354-1.

[15] *See, e.g.,* Doc. 325-1 at 118 (Testimony of Blixseth); Doc. 335-1 at 31.

[16] *See, e.g.,* Doc. 325-1 at 118 (Testimony of Blixseth) (noting that "we [including Mr. Rosen] really got no satisfactory offers"); Doc. 335-1 at 33-34 (noting some interest at "lowball" prices but no "firm offer[s]")).

5

bankruptcy petition against Blixseth in the State of Nevada.[17]

10.     Blixseth thereupon implemented a controversial strategy intended, at least in part, to avoid his involuntary bankruptcy: 1) he would pay off his debts to the States of California and Idaho, and then 2) move to dismiss the involuntary petition for lack of a sufficient number of petitioning creditors.[18]

11.     The chosen strategy, however, required very significant sums of money: 1) for "the defense [of the] involuntary bankruptcy petition", 2) in order to pay off Blixseth's debts to California and Idaho and, 3) to employ lawyers and others to execute the strategy in Nevada.[19]

12.     A "friendly" bid to purchase Tamarindo by Roberto Hernandez ("Hernandez"), the former owner of Tamarindo who first sold the property to Blixseth and who held a right of first refusal to repurchase the resort in the event of any Blixseth sale was devised.[20]

13.     Blixseth contacted James Dolan ("Dolan"), a close personal friend and business partner, who agreed to submit a "friendly" bid to purchase Tamarindo for

---

[17] Doc. 49-1 at ¶ 9 (when Montana [sic] filed the involuntary petition "I had absolutely no choice but to quickly sell El Tamarindo")).

[18] *See generally* Doc. 49-4.

[19] *See generally* Doc. 49-1 at ¶ 9.

[20] Doc. 325-1 at 118-20; Doc. 335-1 at 35.

$13.8 million.[21] Dolan orally provided such a bid to Blixseth, a bid that, in Blixseth's words, "had so much swiss cheese in it you could make a sandwich."[22]

14.    Blixseth orally transmitted the bid to Hernandez who shortly thereafter agreed to purchase Tamarindo at the price established in Mr. Dolan's "friendly" "swiss cheese" bid.[23]

15.    Bilxseth consummated the sale of Tamarindo and of a separate residence at the resort known as "Casa 18" to the same purchaser, Plan Resort, S.R.L., a Mexican entity controlled by Hernandez, on the same day, April 18, 2011, with the same people attending the closing, and before the same notary public in Guadalajara, Jalisco, Mexico.[24]

16.    Immediately after the sale, Blixseth caused approximately $1.925 million of the sale proceeds to be wire transferred to Attorney Michael J. Flynn.[25] Funds from the transfer were used at least in part to pay Blixseth's debts to the California and Idaho taxing authorities involved in the involuntary bankruptcy

---

[21] Doc. 325-1 at 119.

[22] Doc. 325-1 at 119-20; Doc. 335-1 at 39.

[23] Doc. 325-1 at 120; Doc. 335-1 at 40.

[24] Docs. 41-3 and 303-5.

[25] Doc. 337-1 at 186:23-187:21.

7

proceedings.[26]

17.  Notwithstanding that Tamarindo had been sold contrary to the injunction against sale, Blixseth continued to prosecute the motion to vacate the injunction[27] and, later, appeal of the Bankruptcy Court order denying the motion to vacate.[28]

18.  In the summer of 2013, while appeal from the order denying vacation of the injunction was pending before this Court, the Trust first discovered that Blixseth had sold Tamarindo.[29]  The Trust moved the Court to hold Blixseth in contempt.[30]

19.  On December 23, 2013, the Court found Blixseth in contempt for having intentionally violated the injunction and for deliberately misleading the court.[31]  On February 3, 2014, it issued its order of contempt against Blixseth.[32] The contempt order, among other things, required Blixseth to "account fully for

---

[26] *Id.*

[27] Paragraph 6, *supra.*

[28] Doc. 61 at 38.

[29] Docs. 37 and 40.

[30] Docs. 37 and 40.

[31] Doc. 58.

[32] Doc. 65.

the receipt, use, disposition or transfer of any of the proceeds of the sale of the

Tamarindo Property, with full documentation of such receipt, use, disposition or

transfer, (including, but not limited to, all documents relating to the sale

transaction and all bank statements, checks, fund transfer receipts, and any other

relevant bank records of any immediate, mediate, or ultimate recipient of such

proceeds)."[33]

20.    On February 14, 2014 and February 18, 2014, Blixseth submitted sets

of heavily-redacted documents purporting to account for the proceeds of the sale

of Tamarindo.[34]  Upon review of Blixseth's submissions, the Trust requested a

show cause hearing to address Blixseth's failure to comply with the Court's

February 3, 2014 Order.[35]

21.    On February 28, 2014, the Court ordered Blixseth to appear and show

cause why he had failed to comply with the Court's February 3, 2014 Order.[36]

That order to show cause was vacated after Blixseth filed an appeal on March 3,

2014, of the February 3, 2014 Order to the United States Court of Appeals for the

---

[33] Doc. 65 at ¶ 5.

[34] Docs. 68 and 70.

[35] Doc. 72.

[36] Doc. 73.

9

Ninth Circuit.[37] On October 9, 2014, the Ninth Circuit upheld this Court's findings of contempt against Blixseth and the remedies set for in the February 3, 2014 Order.[38] This Court received the appellate court's mandate on November 3, 2014.[39]

22.    On November 20, 2014, this Court reinitiated the prior contempt proceedings and directed that Blixseth appear at a hearing on December 18, 2014, and show cause why he should not be held in contempt for failing to account for the Tamarindo proceeds as required under the February 3, 2014 Order.[40] On December 5, 2014, Blixseth submitted additional documentation related to the sale of Tamarino and a first declaration to support the accounting.[41] Several additional Spanish-language documents purportedly related to the sale of Tamarindo were submitted by Blixseth on December 16, 2014.[42]

23.    On December 18, 2014, the Court conducted a show cause hearing

---

[37] Doc. 77.

[38] Doc. 79.

[39] Doc. 82.

[40] Docs. 83 and 84.

[41] Docs. 89 and 90.

[42] Docs. 97 and 98.

concerning Blixseth's compliance with the Court's February 3, 2014 Order.[43] At that hearing the Court found Blixseth had failed to account for the Tamarindo proceeds.[44] It ordered that Blixseth be incarcerated and held until he fully complied with the requirements outlined in the Court's February 3, 2014 Order.[45]

24.     On December 19, 2014, Blixseth filed emergency motions in this Court to clarify and stay the Court's December 18, 2014 contempt order.[46] Once again, Blixseth did not await a decision on those emergency motions and on December 23, 2014, filed a petition for a write of mandamus and motion for a stay of the incarceration order in the Ninth Circuit.[47] On December 24, 2014, the Ninth Circuit, without input from this Court, granted Blixseth's motion for a stay in part and stayed his incarceration for thirty days to allow this Court to enter an order further specifying how Blixseth could comply with the Court's February 3, 2014 Order.[48]

25.     On January 9, 2015, this Court issued its order specifying precisely

---

[43] Docs. 99 and 103.

[44] Doc. 100.

[45] *Id.*

[46] Docs. 104 and 106.

[47] Doc. 109.

[48] Doc. 110.

11

what Blixseth had to provide to properly account for the proceeds of the Tamarindo sale.[49] On January 16, 2015, Blixseth submitted an additional declaration and declarations from Salvadore Palomino, Alejandro Moya, Patrick Ratte, and Benjamin C. Rosen, along with additional supporting documents.[50]

26.     On January 22, 2015, the Court held a status conference and granted Blixseth an additional two-week period within which to comply with the January 9, 2015 accounting order.[51] On February 6 and 7, 2015, Blixseth filed several hundred pages of additional documents and declarations purporting to comply with the Court's previous orders of February 3, 2014.[52] On February 20, 2015, the Trust filed a response to what Blixseth then claimed to be a complete accounting in which it identified numerous deficiencies in the accounting and numerous failures to comply with the Court's previous accounting orders.[53]

27.     On April 20, 2015, the Court held yet another show cause hearing to address Blixseth's several submissions, purportedly in compliance with the

---

[49] Doc. 112 at 2-8.

[50] Doc. 113.

[51] Docs. 119, 121, and 125).

[52] Docs. 129-150.

[53] Doc. 152.

Court's prior orders to account for the sale proceeds of Tamarindo.[54] In a twenty-eight page order, which followed the hearing, the Court concluded that the accounting still failed to comply with the Court's prior orders and immediately ordered that Blixseth be incarcerated until he provided a full accounting of the Tamarindo proceeds.[55] The Court's order provided a detailed procedural history of the proceedings up to that point. It also outlined numerous specific deficiencies in the accountings and failures to comply with the Court's prior orders, including the January 9, 2015 Order.[56]

28.     Blixseth responded with yet another petition for a writ of mandamus and emergency motion for a stay.[57] The Court of Appeals denied the motion for a stay three days later.[58] However while the petition for a write of mandamus was still pending, on June 4, 2015, Blixseth filed yet another accounting, his most recent, in which he repackaged his prior accountings with a new summary prepared by Cameron Keller, a certified public accountant with the firm of Keller

---

[54] Docs. 158, 159, and 162.

[55] Doc. 159.

[56] *Id.*

[57] Doc. 167.

[58] Doc. 169.

13

CPAs.[59]  Based upon the "new accounting," Blixseth once again petitioned the Court on June 4, 2015, for immediate release from incarceration[60] and once again, without waiting for the Court to consider the June 4, petition, filed a new motion for a stay of the proceedings before the District Court on June 5, 2015.

29.　On June 8, 2015, Blixseth filed an emergency motion with the Court of Appeals seeking immediate release.  On June 11, 2015, the Court of Appeals dismissed Blixseth's second petition for a writ of mandamus and all pending motions.[61]  On June 12, 2015, the Trust filed a response to the "new accounting" and to Blixseth's petition for immediate release.[62]

30.　On July 2, 2015, the Court convened a status conference to address to Blixseth's most recent petition for immediate release.[63]  By order entered with the parties' advice and consent, on July 21, 2015, the Court set the matter for an evidentiary hearing and established a detailed schedule for discovery and for submission of pre- and post-trial pleadings.[64]  Even after participating in the

[59] Doc. 178.

[60] Doc. 177.

[61] Doc. 188.

[62] Doc. 189.

[63] Doc. 194.

[64] Doc. 248.

discussions concerning the scheduling of the contemplated hearing, Blixseth filed yet another petition for a writ of mandamus–his third such petition–along with yet another emergency motion for a stay of incarceration.[65] After briefing on the mandamus petition, the Court of Appeals dismissed the petition and denied Blixseth's stay motion as moot.[66]

31. On October 5, 2015, the Court conducted a pretrial conference with the parties. At this conference, the Court noted that it expected "Mr. Blixseth and his witnesses to be prepared to meet each and all of the requirements as set out in the Court's prior orders. No exceptions. No – as has been endeavored before – no substantial compliance efforts by Mr. Blixseth. I will not accept substantial compliance."[67]

At the hearing on October 19, 2015, Blixseth introduced into evidence the deposition transcripts of Fausto Verde, a former Blixseth employee at the Tamarindo Resort, Salvadore Palomino, the former accountant for the Tamarindo Resort, Benjamin Rosen, an attorney who represented Blixseth in connection with the sale of the Tamarindo Resort and Tamarindo house, and Patrick Ratte,

[65] Doc. 200.

[66] Doc. 283.

[67] Doc. 327 at 9:22-10:2.

Blixseth's former controller.[68] Blixseth called only one live witness at the hearing, Cameron Keller, the accountant who prepared the June 4, 2015, accounting and upon which Blixseth relied to support compliance with the Court's accounting Orders and in petitioning for his immediate release in June 2015.[69]

32. Blixseth attended the hearing. He elected not to testify. He made no statement in support of the June 4, 2015, accounting about which Keller testified or otherwise.[70]

### *Findings of Fact Regarding Blixseth's Accounting*

33. The Court's orders of January 9, 2015, and April 20, 2015, set out in specific detail the form and substance of statements, data and explanations to be furnished by Blixseth which were necessary to appropriately account for the expenditure and disposition of the proceeds received from the sale of Tamarindo. Portions of those requirements, together with the Court's findings as to whether Blixseth has met or complied with the Orders' terms are discussed in the table which follows.

---

[68] Doc. 346 at 14-15.

[69] Doc. 346 at 17; It is of course the settled law of the Ninth Circuit that opinions of persons testifying as experts "should be judged just like any other testimony" to be accepted or rejected or given as much weight as deserved. *See* Ninth Circuit Model Jury Instructions 2.11.

[70] *See* Doc. 346.

*1. Separate account statements by Blixseth personally, under penalty of perjury, in compliance with 28 U.S.C. § 1746, together with documents which support and verify the statements and annotations in the statements which provide pinpoint citations to the record, disclosing and setting forth each of the following:*

> *A.   The receipt of each payment from the purchaser of the Tamarindo Resort (including payments made to third parties, such as the Tamarindo Club Association) by date, amount and banking institution information (account owner name, institution name, account number, etc . . .) in which the deposit was made. Every transaction is to be supported by appropriate supporting documentation (deposit ticket and check copy, wire transfer documentation, contract, applicable bank statements, etc.) or bates stamp reference to appropriate documentation. The statement is to include a calculation of the total of the transactions;*

Blixseth made no personal declarations or offered any testimony as required by the Court's orders. Instead he cited prior declarations, relied fully and completely upon the work of others and declared only that their work appropriately accounted for the Tamarindo sale proceeds.[71] Blixseth did not attempt, by way of proffer, to place before the Court any declarations he may have made prior to October 19, 2015. He did not seek to have any such prior declaration made a part of the hearing record. Although present in court at the hearing, he declined to testify and declined to submit himself to examination or cross-examination by counsel or to answer questions by the Court.

---

[71]Docs. 89-1, 113-1, 130, and 178.

No statements or statements supporting or verifying any of the accountings have been provided by Blixseth. Notwithstanding that Blixseth directed and controlled every aspect of the sale of Tamarindo and of distribution of the proceeds, he has provided nothing of significance to assist in the task of producing the required accounting.

Blixseth did not, as ordered, separately identify each payment from the purchaser by date, amount, and banking institution. Instead, compliance if any, must be gleaned from bank accounts, general ledgers, and the Keller accounting summary of the various Blixseth entities into which the payments were made. Such a task, requiring the Court to carry out and complete a trace of particular information through at least four different documents plainly does not comply with either the letter or spirit of the Court's orders.[72] Blixseth provided no supporting documentation for any of the payments received from the purchaser of Tamarindo, other than (1) the deed of trust and (2) the bank statements into which such proceeds were deposited.[73]

The bank account statements referenced in the Keller accounting summaries as the relevant backup documentation for receipt of the payments are, moreover,

---

[72] *See generally* Ex. 83 and Doc. 178-1.

[73] *See, e.g.,* Ex. 83, Doc. 181-1 at 1, Doc. 180-15 at 1, and Doc. 180-17 at 1.

written entirely in Spanish and denominated in pesos, making it impossible, absent

reliable translations into English, to corroborate the summaries.[74] The Keller

accounting reports[75] are purported to cross-reference to English translations of

those bank account summaries, but cannot be relied upon or accepted as reliable.

> *B.*      *Each payment by payee, date, amount, and purpose, of all*
> *other costs associated with the closing of the Tamarindo Club*
> *sale transaction. Every transaction should be supported by the*
> *appropriate documentation (contract, cancelled checks, wire*
> *transfer information, etc.) or bates stamp reference to the*
> *appropriate documentation. The statement is to include a*
> *calculation of the total of the transactions;*

The accounting for the costs of closing of the sale transaction remains as

one of the most elusive, unsatisfactory, and unreliable aspects of the entire

accounting. Closing costs were accounted for in multiple different ways in

multiple different accountings. The various accountings, some by express

admission, provided entirely different and inconsistent accountings of the closing

costs.[76] As a result, it remains practically impossible to construct an accounting of

---

[74] *See id.*, (cross-referencing ER 5606, 6926, 6917, and 6972).

[75] Doc. 333-2.

[76] *See, e.g.,* Doc. 113-1.

the costs associated with the closing. In particular, there is no reliable information regarding the purpose of any of the closing costs beyond the most general statements made without any real documentary backup.

> C. *Each intercompany and banking institution transfer of the proceeds of the Tamarindo Resort sale denoting payer, payee, date, amount, banking institution information, and purpose. Every transaction should be supported by appropriate documentation (cancelled checks, deposit details with check copy, bank statements, etc.) or bates stamp reference to appropriate documentation;*

The accounting contains intercompany and banking institution transfers of proceeds from the Tamarindo sale denoting payer, payee, date, amount, and banking institution information.[77] Nowhere, however, is there any explanation of the purpose, as required, of such intercompany transfers.[78] Indeed, Keller testified that he had "no understanding of what the different entities' functions were or what they did" and did not know "why all the intercompany transfers were happening on any of these."[79] Moreover, on the face of the accounting, there are gaps in the documentation concerning intercompany transactions.[80]

---

[77] *See, e.g.,* Ex. 83, Doc. 180-1 and documents referenced therein.

[78] *See, e.g.*, Ex. 83, Doc. 178-2 at 1 and 15-17 (failing to attribute and "purpose" for dozens of intercompany transfers involving Western Air & Water).

[79] Doc. 346 at 101.

[80] *See, e.g., id.* (showing many blanks in the column "For Additional Support Documents," each indicating a transaction without any supporting documentation).

20

> D. *Each payment denoting payer, payee, date, banking institution information, and amount of the taxes and labor debts for which the Tamarindo Resort purchaser withheld for each of the $2,000,000 holdbacks. Every transaction should be supported with appropriate documentation (contract, invoice, cancelled check, wire transfer information, etc.) or bates stamp reference to appropriate documentation. The statement is to include a calculation of the total of the transactions; and*

Nowhere are payment of taxes and labor debts for which the purchaser held back $2,000,000 categorized.[81] The Keller accounting simply produced summaries in one form or another of the payments said to have been made by Blixseth's Mexican entities.[82] The accounting provides no information from which the Court can identify with any specificity or certainty the payer, payee, date, banking institution information or amount of the taxes and labor debts for which funds were held back. The accounting does not include a calculation of the total of those transactions.

> E. *Each payment or other distribution of the proceeds of the Tamarindo Resort sale to third parties denoting payer, payee, date, amount, and purpose. Every transaction should be supported by appropriate documentation (contract, invoice, cancelled check, wire transfer information, etc.) or bates stamp reference to appropriate documentation. The statement is to include a calculation of the total of the transactions.*

---

[81] *See, e.g.,* Doc. 346 at 118.

[82] *See id.* at 117-18.

21

Numerous entries fail to identify or specify the payee to whom payments were made.[83] Only the barest statements of the purpose of any of those transactions (e.g., the broadest of categories such as operating or vendor expenses) are provided.[84] The amount of missing documentation and information, including information concerning the specific payees of payments, is increased significantly for the Mexican entities.[85] In addition, the referenced supporting documents for the Mexican entities are written entirely in Spanish and denominated in pesos,[86] making it impossible to reliably corroborate the accounting summaries to English translations of the documents.[87] The accounting totals payments and distributions only on an entity-by-entity basis. It does not separately categorize the payments and distributions or provide totals of such payments and distributions.[88]

In particular, Blixseth has not supported by appropriate documentation, as ordered, each payment or distribution of the proceeds of the Tamarindo sale to third parties. The accounting does not set out each payment to third parties and

---

[83] *See, e.g.,* Doc. 346 at 126-27.

[84] *See* Ex. 83 at *passim.*

[85] Doc. 346 at 132.

[86] Doc. 346 at 114.

[87] Doc. 333-2.

[88] *See* Ex. 83, Doc. 178-1.

does not provide adequate supporting documentation as reasons that third party

recipients were entitled to specific amounts of Tamarindo sale proceeds. A total

of $3,389,156.17 in payments were made to third parties without any supporting

documentation. Without such proper supporting documentation, the Court is left

without capacity to determine whether the initial transfer was for a legitimate

purpose, whether it was in reality a devise for movement of funds through a third

party to get it to Blixseth, or whether or to what extent the money ultimately

wound up in Blixseth's hands or in the hands of some other entity that he owned

or controlled. The accounting and supporting documentation do not comply with

or meet the requirements of the January 9, 2015 Order.

    *2.    The general ledger of the entity owned by Mr. Blixseth or any of Mr. Blixseth's companies that owned or shared partial ownership of the Tamarindo Resort for the period covering sale of the Tamarindo Resort and any subsequent disbursement of sale funds. Identification or cross-reference to any production in response to this Order should be clearly identified with pinpoint citations to the record or otherwise described.*

    Blixseth has not submitted general ledgers of any of the Mexican entities

that appeared to own or share ownership of Tamarindo. Instead, Excel

spreadsheets prepared by Palomino, Blixseth's Mexican accountant, purportedly

containing information from the Mexican entities' books and records were

submitted. Palomino provided no testimony specifically explaining the

background and circumstances of his preparation and production of these

23

spreadsheets.[89]  The ownership structure of Tamarindo remains fundamentally

undefined.  Meaningful evidence concerning its ownership structure was never

provided.[90]

      3.     *The general ledger of any individual or entity that directly received*
*funds from the purchaser of Tamarindo Resort for the period covering sale*
*receipts and any subsequent disbursement of sale funds.  Identification or cross-*
*reference to any production in response to this Order should be clearly identified*
*with pinpoint citations to the record or otherwise described.*

      Blixseth provided no general ledgers, as required, of any of the Mexican

entities that directly received funds from the purchaser of Tamarindo,  although

general ledgers of the U.S. entities that appear to have received Tamarindo

proceeds were provided.  The accounting did not cross-reference or identify

distributions in those general ledgers.  Keller testified that he primarily used the

bank account statements rather than the general ledgers in preparing his

accounting, as, in his words, "the general ledgers can be changed or manipulated

or someone could put in whatever they, you know, chose to put in."[91]  His reliance

on documents other than documents ordered produced was neither reliable nor

---

[89] *See, e.g.,* Doc. 346 at 86-90.

[90] In a recent declaration Blixseth purported to describe the ownership structure of the
Tamarindo Resort. (Doc. 303-1).  Blixseth's statement appears, however, to be internally
inconsistent, as he states unequivocally that both he and Casa 18, LLC owned Casa 18 S.R.L.
(Doc. 303-1 at ¶ 3).

[91] Doc. 346 at 46-47.

acceptable as a substitute.

    *4.    Legible and successively chronological bank account statements (a) showing all deposits of the funds received directly from the purchaser of the Tamarindo Resort at closing or at any time thereafter; and (b) documenting the full present and future disposition of those funds from all accounts into which the funds received at closing were deposited. Identification or cross-reference to any production in response to this Order should be clearly identified with pinpoint citations to the record or otherwise described.*

Blixseth has produced legible and largely successively chronological bank statements showing deposit of funds from the purchase of Tamarindo which documented most of the disposition of those funds from those accounts. He did not, however, produce full and complete bank account statements of Casa 18, the entity that sold Blixseth's allegedly separate home on the Tamarindo Resort property and which appears to have received proceeds of the Tamarindo sale.[92] He also failed to produce complete copies of his wife's bank account statements,[93] leading the Court at the hearing to express its concerns that the documents had been "high graded."[94] Although Blixseth's lawyer committed in open court to making an offer of proof as to the circumstances surrounding the failure to produce certain documents,[95] no such offer of proof was ever made.

------

[92] *See* Ex. 83, Docs. 180-23 and 180-25.

[93] *See* Doc. 346 at 173-79.

[94] Doc. 346 at 176-77.

[95] *Id.* at 178.

5.    *A statement by Blixseth personally, under penalty of perjury, in compliance with 28 U.S.C. § 1746, together with documents which support and verify the statement and which include pinpoint citations to the record, showing all subsequent transfers of funds associated with the sale of Tamarindo Resort to any individual or entity for any purpose (including payment of debt) and the reasons such individuals or entities were entitled to the money (with documents that verify the entitlement). Identification or cross-reference to any production in response to this Order should be clearly identified with pinpoint citations to the record or otherwise described.*

As noted, Blixseth's prior declarations were not proffered at the hearing and were not a part of the hearing record. Blixseth has yet to make any statements personally attesting to the receipt or disposition of any of the Tamarindo proceeds, despite the fact that he attended the closing as the seller's sole representative and personally received a check representing at least $8.7 million of those proceeds at the closing.[96]  Similarly, Blixseth never testified as to the purpose or reasons for which any individuals or entities were entitled to and did receive any payment or distribution of money.[97]  Blixseth's failure to testify as to his receipt of proceeds and the purpose of any of the transfers or distribution is fatally problematic.  None of Blixseth's accountants or former employees testified as to either subject, other than Ratte's very limited testimony regarding some of the transfers between Blixseth's U.S. entities.[98]

---

[96] *See* Docs. 89-1, 113-1, 130, and 178.

[97] *See id.*

[98] *See* Doc. 337-1 at 183-84.

26

6. *The general ledgers and bank account statements of any current or former Blixseth-controlled entity or individual account bearing Blixseth's name into which the Tamarindo Resort sale proceeds were transferred from the initial individual or entity depository account or accounts. Identification or cross-reference to any production in response to this Order should be clearly identified with pinpoint citations to the record or otherwise described.*

Blixseth produced general ledgers for only part of his U.S. entities. He has not produced, as required, general ledgers for any of the Mexican entities or for Western Pacific Timber, LLC or Desert Ranch Management, LLC in the U.S.[99] Some bank account statements for certain Mexican and U.S. entities, other than Western Pacific Timber, LLC and Desert Ranch Management, LLC were produced.[100] However, bank account statements produced for Casa 18 S.R.L. and his wife, Jessica Blixseth, are incomplete.[101] The Keller accounting summary cross-references and identifies the transfers only to bank account statements and not as to the general ledgers.[102] As to the Casa 18 transfers, the Keller accounting summary cross-references very limited transactions identified in the limited portions of the bank account statements produced, without any explanation.[103] The materials provided do not permit any meaningful review or assessment as to

---

[99] *See generally* Ex. 83.

[100] *See generally* Exs. 60-68, 76, 78-81, 83.

[101] *See, e.g.,* Ex. 38, Doc. 359-5, Ex. 83, Doc. 180-23, and Doc. 346 at 173*ff.*

[102] *See* Ex. 83; Doc. 346 at 25.

[103] *See, e.g.,* Ex. 83, Docs. 180-23, 180-24, and 180-25.

27

whether the Keller accounting summary included all transfers identified in the

bank account statements and general ledgers.

>7.     *Legible copies of all cancelled checks, all wire transfer records, and supporting documentation that verify, support, or identify the purpose of the payment relating to the disposition of Tamarindo Resort proceeds from any of the foregoing accounts.  Identification or cross-reference to any production in response to this Order should be clearly identified with pinpoint citations to the record or otherwise described.*

The U.S. bank account statements contain copies of cancelled checks.  And

the Keller accounting summary asserts to cross-reference and identify supporting

documentation for some parts of payments relating to the disposition of the

Tamarindo Resort proceeds.[104]  There are, however, significant gaps in the backup

documentation.  It remains difficult and in some cases impossible to identify the

purpose of payments made.  And, as noted, the specifically cross-referenced

backup documentation is in Spanish and denominated in pesos.  What is claimed

to be backup documentation written in Spanish and denominated in pesos is of

little to no useful purpose to the Court.

>8.     *With respect to each Blixseth entity or personal accounting document produced, a 28 U.S.C. § 1746 certification must be included by the accountant, custodian of the record thereof, or another person qualified to testify as to the facts and circumstances relating to the preparation, accuracy, and completeness of each document.*

No testimony or certification was provided as to the documents and

---

[104] *See* Ex. 83.

information furnished by or on behalf of Jessica Blixseth. No assessment or verification of the accuracy or completeness of such information is possible.

9. *All documentation (including emails), from February 3, 2014, through the date of this Order, concerning or relating to Blixseth's efforts, and responses to his efforts, to locate and communicate with his or Tamarindo Resort's former employees or agents in Mexico and to locate and obtain accounting documents and bank statements in their possession or of which they have knowledge.*

The record discloses that Blixseth did little, if anything, after February 3, 2014, to locate and communicate with his former employees or agents in Mexico and to locate or obtain accounting documents and bank statements.[105] He has not testified or offered other explanation as to his efforts to locate such former employees or documents since providing limited email correspondence in January 2015.

10. *English language translations of all produced documents originally written in the Spanish language, certified by the translator under 28 U.S.C. § 1746, of all currency conversions for transactions which used Pesos as the medium of exchange on the date of the transaction, and which were certified by the accountant under 28 U.S.C. § 1746.*

Blixseth produced English language translations of certain documents originally written in the Spanish language. Those English translations, however, generally were not cross-referenced to the Spanish documents. The record fails to support compliance with this provision of the order. Despite ample opportunities to do so evidence of compliance has not been provided. Blixseth has not

---

[105] *See* Docs. 113-1 and 113-3.

submitted any declaration or other evidence as to the methodology used for currency conversions for peso-denominated transactions. The failure to provide such conversions is particularly glaring in the context of the Keller accounting summary which contains informations in dollar denominations but appears, where provided, to refer exclusively to peso-denominated backup documentation. Keller disclaimed knowledge of Palomino's qualifications for evaluating exchange rates and noted that he personally did not have any particular qualifications.[106] Palomino for his part testified only that he used the same conversion rate as used in the Tamarindo Resort deed of sale and that he used that same rate for every transaction, regardless of the date of transaction.[107] There is no evidence in the record as to the accuracy or reliability of the peso-dollar conversion used.

34.  Blixseth's accounting, at best, contains major gaps that prohibit meaningful reliance on the accounting and effectively impede and thwart the ability of the Court to trace the disposition of the proceeds of the sale of Tamarindo.

35.  Of significance is the reality that Blixseth's accounting contains major gaps in the accounting as to Casa 18 S.R.L., gaps that appear to be

---

[106] Doc. 346 at 108.

[107] Doc. 338-1 at 35 and 39.

deliberate and intended to disrupt and effectively thwart any efforts by the Court to fully understand the Tamarindo sale and the disposition of sale proceeds.

a. Blixseth has offered no explanation for fourteen wire transfers made by Casa 18, S.R.L. to Kawish, LLC between April 25, 2011, and December 28, 2011, totaling nearly $6.5 million.[108]

b. The Palomino Declaration recites that some $4.474 million–not $6.5 as claimed by Ratte[109]–of the proceeds of the sale of Tamarindo as stated flowed through Casa 18 S.R.L. before being transferred to Kawish, LLC.[110] Neither Blixseth nor anyone else has ever explained this over $2 million dollar discrepancy or why the Tamarindo Resort proceeds passed in the first place through Casa 18 S.R.L., an entity which Blixseth claims was entirely separate and distinct from Tamarindo.[111] The Keller accounting summary provides no explanation of the purpose of some $3.7 million of the transfers and only the most

---

[108] *See* Ex. 71 and Doc. 369-4.

[109] *See* Ex. 71.

[110] *See* Ex. 1 at 1.

[111] *See* Doc. 303-1 at ¶ 4.

cryptic description is provided for $765,000 of those transfers identified only as "loan payable" without any further explanation or reference to backup documentation.[112]

c.   Blixseth provided no accounting for the proceeds of the allegedly separate home sale, leading to significant questions, particularly because Blixseth transferred $4.5 million of Tamarindo Resort proceeds through Casa 18 S.R.L. with no meaningful explanation, as to whether the two sales of Tamarindo and the home really were separate.

d.   The current record supports the conclusion Blixseth that appears determined to evade any disclosures relating to the alleged house proceeds and Casa 18 S.R.L.'s financial information.  In stark contrast to more complete bank account statements he provided for his other Mexican entities, Blixseth produced only limited and incomplete excerpts of the bank account statements of Casa 18 S.R.L.[113]

e.   Blixseth's failure to produce complete statements for the Casa

---

[112] *See* Ex. 83 and Doc. 180-20.

[113] *See* Ex. 83, Doc. 180-23, and 180-25.

18 S.R.L. bank accounts, accounts into which Blixseth deposited proceeds of the sale of the Tamarindo Resort, not only violates the express requirements of the Court's accounting order, but it also effectively frustrates a full and complete accounting of the Tamarindo sale proceeds.

36.    At bottom, Blixseth's accounting still fails to effectively trace the proceeds through his various entities and accounts. Although Keller testified that he had successfully traced the funds through the system and out to third parties.[114] However, Keller provided no explanation of how he had come to that conclusion and, in fact, his testimony suggested that some funds remained in some of the accounts.[115]  Records produced fail to identify many payees to whom payments were made and, as noted above, wholly fail to identify many third-party payees. The accounting firm hired to produce a complete accounting and tracing of funds has, inexplicably, failed or declined to effectively to trace the funds through the accounts to show that the proceeds have, in fact, been fully dissipated.

37.    Blixseth's ongoing refusal to explain to purpose of his many intercompany transfers, itself, leaves a massive gap in the accounting.  The same

---

[114] Doc. 346 at 74-75.

[115] *See* Doc. 346 at 161.

may be said with respect to the payments and other transfers of the Tamarindo Resorts proceeds. The failure is compounded by the fact that the accounting nowhere attempts to categorize any of the payments and other transfers.[116] The Court's accounting order expressly required a description of the purpose of those intercompany transfers and third-party payments and distributions.[117] Blixseth has failed to provide any description of the former and his accounting contains many gaps as to the latter.

38. Citations to full and complete backup documentation were not provided. Rather the Keller accounting summaries highlight missing information and backup documentation. This unacceptable technique stands in stark contrast to the order to produce such records, even as to Blixseth's U.S. entities. In each Keller summary are numerous expenses for which "additional support documents," are not provided.[118] Many summaries contain numerous entries for payees such as "unknown," "payroll," "employees," or "client" for which no other information is provided on the particular payees as required by the accounting

---

[116] *See* Doc. 152, Ex. 3.

[117] Doc. 112, ¶¶ 1.c. and 1.e.

[118] *See, e.g.,* Ex. 83, Doc. 178-2 (Western Air & Water), Ex. 83, 178-7 (Desert Ranch, LLC) and Ex. 83, 179-8 (Kawish).

order.[119]  The absence of any further detail on all those items raises questions which cannot be answered as to whether those funds may have been transferred to Blixseth or to any of his related companies or family members.  At a minimum, the Court is left to assume the accuracy, reliability, and veracity of the new accounting's designations with no way of testing or confirming them.

39.     As noted above, impediments arise from Blixseth's production of financial records in the Spanish language and with funds designated in pesos. Explanations related to translation of such records into English have not been satisfactory to permit the Court to make any reasoned determination related to such matters.[120]  Although Keller subsequently provided a table cross-referencing the Spanish-language documents to the English translations on the eve of the hearing,[121] it remains difficult, even impossible in some cases, to identify accurate and comprehensible backup documentation for many of the Mexican transactions.

40.     Blixseth has yet to produce missing documents first brought to the

---

[119] *See, e.g.*, Ex. 83, Doc. 178-2 at 8, 9, and 11 (showing five payments to unknown payees for unknown purposes totaling $13,083.53), Ex. 83, Doc. 179-2 at 2-12 (showing purported payments of payroll to unknown payees totaling $522,078.17), Ex. 83, Doc. 180-1 at 3, 5, 6, and 11 (showing $77,181.74 payment and three smaller amounts to "employees" with no further information provided), and Ex. 83, Doc. 180-1 (showing roughly twenty-five payments to "client").

[120] *See* Ex., Docs. 148-150.

[121] Doc. 333-2.

fore in February 2015. Examples are:

a.   Blixseth has repeatedly claimed that he no longer controls Western Pacific Timber ("WPT").[122]  However, he made no effort by discovery to have records of WPT produced by subpoena for inspection, copying, and assessment.

b.   Blixseth has still failed to produce records of Desert Ranch Management, an entity he still controls, regarding management fees claimed to be due from Desert Ranch Management to his son which were actually paid by a different entity out of the Tamarindo proceeds.[123]

c.   Bank account statements of Blixseth's wife, which were produced,[124] were heavily excerpted.  No bank account statements for his son were produced despite the fact that both his wife and his son received substantial amounts of proceeds of the Tamarindo sale.  Blixseth failed or refused to testify to explain the missing documentation or his efforts to obtain them.

---

[122] *See e.g.,* Doc. 178 at ¶ 8.

[123] *See, e.g.,* Doc. 178 at ¶ 9.

[124] *See* Ex., Doc. 181-26 (Jessica Blixseth accounts).

41.    Finally, Blixseth has still failed to declare or testify based upon his own personal knowledge as to the accuracy and completeness of the accounting. It remains the work product of former accountants, former employees, and most recently, a hired accountant tendered as an expert witness. Blixseth has refused to testify or to take personal responsibility for the accounting of the proceeds of the sale of Tamarindo despite the orders of this Court to do so. The conclusion that Blixseth continues deliberately to conceal matters relating to the disposition of the Tamarindo proceeds is inescapable. The many inconsistencies and deficiencies that the Court has repeatedly noted in Blixseth's various accountings,[125] are neither minor nor inconsequential. The Court remains unable to assess the accuracy, reliability, or completeness of the accounting. Blixseth has not complied with the Court's orders for an accounting–either literally as the Court ordered or substantially. The accounting that has been proffered on the record cannot be and is not substantial compliance. No justification for immediate release of Blixseth under the Court's January 9, 2015, or April 20, 2015, Orders, or otherwise, has been established. Blixseth will remain in custody until an appropriate accounting justifying release is made.

## CONCLUSIONS OF LAW

[125] *See, e.g.,* Doc. 159 at 13.

37

1.     "When a court employs 'the extraordinary remedy of injunction,'
*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312, (1982), it directs the conduct
of a party, and does so with the backing of its full coercive powers. *See* Black's
Law Dictionary 784 (6[th] ed.1990) (defining 'injunction' as '[a] court order
prohibiting someone from doing some specified act or commanding someone to
undo some wrong or injury')." *See Nken v. Holder*, 556 U.S. 418, 428 (2009).

2.     "While a court has discretion to excuse minor, technical, or good faith,
violations of an injunction, *see, e.g., Go-Video*, 10 F.3d at 695, it likewise has
discretion to punish substantial violations when appropriate." *Irwin v. Mascott*,
370 F.3d 924 (2004).

3.     It is a "settled principle[] of the law of civil contempt" that requires a
party "to comply with a court order that is both specific and definite." *Balla v.
Idaho State Bd. of Corrs.*, 869 F.2d 461, 465 (9th Cir. 1989).  The Court's orders of
January 9, 2015, and April 20, 2015, were both specific and definite.

4.     The Court's January 9, 2015, Order,[126] which spells out exactly what is
required of Blixseth to properly account for the proceeds from the sale of
Tamarindo, was both specific and definite. The order of April 20, 2015, was
equally specific and definite.

---

[126] Doc. 112.

5.    Moreover, the Court of Appeals ruled that the January 9, 2015 Order satisfies those standards when it dismissed Blixseth's orginal petition for a writ of mandamus as moot.[127]  Blixseth remains in substantial violation of the express terms and provisions of the January 9, 2015 Order.

6.    As a result of Blixseth's failure to account for the proceeds from the sale of Tamarindo in accordance with the January 9, 2015 Order, Blixseth remains in contempt of the Court.  Blixseth will remain in custody until he provides an appropriate accounting in compliance with the January 9, 2015 Order.

7.    Blixseth's present situation is of his own making.  He and he alone controlled and directed every aspect of all that has occurred.  His deliberate violation of the Bankruptcy Court's order against the sale of Tamarindo was his decision and his alone.  The expenditures of the proceeds received from the sale were carried out precisely as directed by Blixseth.  He totally controlled the form and the substance of the accounting documents produced including what was disclosed and, more significantly, what was deliberately omitted and withheld from disclosure.  In the end, the Court is left with more unanswered questions about what happened to the sale proceeds than have been answered.

---

[127] Doc. 165.

ORDERED:

To this day, Blixseth has not fully and completely accounted for the Tamarindo sale proceeds. He has not provided an acceptable accounting and has not complied, even substantially, with the Court's Orders of January 9, 2015 and April 20, 2015. He remains in contempt and, from the record, remains unrepentant.[128]

DATED this _30th_ day of December, 2015.

SAM E. HADDON
United States District Judge

---

[128] The Court's ruling today does not reach or resolve significant questions which are presented and remain as to whether the proceeds received by Blixseth from the sale of Tamarindo were subject in law to a constructive trust prohibiting him from further expenditure or dissipation of such proceeds. *See, e.g., Moore v. Crawford*, 130 U.S. 122 (1889); *Lockheed Corp. v. Spink*, 517 U.S. 882 (1996); *In re Seaway Exp. Corp.*, 912 F.2d 1125 (9th Cir. 1990).